[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11507
Argument Calendar
_____

D.C. Docket No. 1:08-cv-00155-KD-N

ROBERT ADAMS, NELSON BUMPERS,
FREDERICK A. CARTER, SR.,
ALVIN CUNNINGHAM, SIDNEY HEDGEMAN,
TESHA HOLLIS, LARRY J. LAFFIETTE,
RON LAW, JEROME PETTIBONE,
RAHMAN K. PRATT, NATHANIEL L. REED,
CAROLYN SLAY, GLORIA SULLIVAN,
FRANKLIN THOMAS, FREDERICK WILLIAMS,

Plaintiffs-Appellants,

versus

AUSTAL, U.S.A., L.L.C.,

Defendant-Appellee.
_____

Appeals from the United States District Court
for the Southern District of Alabama
_____
(June 17, 2014)

Before PRYOR and COX, Circuit Judges, and ROSENTHAL,[*] District Judge.

_____

[*] Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

PRYOR, Circuit Judge:

This appeal involves complaints of a racially hostile work environment at a shipyard in Mobile, Alabama, owned by Austal, U.S.A., L.L.C. The complaints allege harassment that included vulgar racial graffiti in the men's restroom, appearances of nooses, displays of Confederate flags, and utterances of racial slurs. For almost ten years, Austal repeatedly scrubbed the graffiti from the restroom walls until it finally wised up and painted the walls black. For the most part, the graffiti then ceased. Eventually, 24 African-American current and former employees of Austal filed complaints of racial discrimination. The district court granted summary judgments against the claims of 13 of the employees on the ground that their work environments were not objectively hostile. The district court divided the claims of the remaining plaintiffs to be adjudicated in multiple jury trials. This appeal concerns the 13 orders granting summary judgment in favor of Austal and the jury verdicts against two of the plaintiffs who went to trial, all of which involve claims of a hostile work environment.

In this appeal, we must decide whether an employee may rely on evidence of racial harassment of which he is not personally aware to prove that his work environment was objectively hostile. Although we have held that an employee may introduce evidence of harassment which he is not personally aware to prove that

2

his employer is responsible for the harassment or to rebut an affirmative defense, *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286–87 (11th Cir. 2008), our Court has not ruled that this kind of "me too" evidence can prove that a work environment is objectively hostile. We now hold that an employee alleging a hostile work environment cannot complain about conduct of which he was oblivious for the purpose of proving that his work environment was objectively hostile. We nevertheless conclude that seven of the employees presented sufficient evidence that their work environments were objectively hostile, and we vacate the summary judgments against them. We affirm the summary judgments against the remaining six employees and affirm the two jury verdicts.

## I. BACKGROUND

Austal is an Australian company that builds custom aluminum ships for commercial and military use. In 1998, Austal established a shipyard in Mobile, Alabama. Austal began operations with fewer than 100 employees, but it currently employs more than 2,000 workers.

The record contains substantial evidence of serious racial misconduct at the shipyard owned by Austal. Austal disputes much of this evidence, but we view the evidence in the light most favorable to the plaintiff. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012). The employees allege,

3

for example, that vulgar racial graffiti of the following kind frequently appeared in the men's restrooms on its premises: "see, niggers travel in packs just like monkeys"; "[t]he only people wearing union shirts are the lazy-ass niggers"; "[h]ow do you keep ten niggers from raping your wife, give them a basketball"; "white is right"; "why don't niggers use aspirin? Because they don't want to pick the cotton off the top"; "I'm not a full-fledged white man until I split the raw, black oak"; "KKK is getting bigger"; "[h]ow do you starve a nigger to death?  Hide his food stamp card in his work boots." Austal cleaned the bathroom every few weeks and eventually painted the walls black. Several of the employees also saw or heard about a noose found in the breakroom at Austal in May 2008. Some employees saw multiple nooses. In total, employees discovered eight nooses at Austal while the plaintiffs worked there. Several of the employees' white counterparts also offended them by wearing or displaying Confederate flag paraphernalia. And several employees allege that white supervisors and coworkers called them or another African-American employee "boy," "monkey," and "Jeffrey."

A key dispute involves the frequency of exposure to the racial misconduct that each employee experienced. When it moved for summary judgment against all the claims of a racially hostile work environment, Austal contested whether the employees had proffered substantial evidence that a reasonable person would find

4

the racial harassment of each employee sufficiently severe or pervasive. The district court granted 13 of the motions for summary judgment in favor of Austal.

For 13 of the employees—Robert Adams, Nelson Bumpers, Alvin Cunningham, Tesha Hollis, Larry Laffiette, Ron Law, Jerome Pettibone, Rahman Pratt, Nathaniel Reed, Carolyn Slay, Gloria Sullivan, Franklin Thomas, and Frederick Williams—the district court ruled that "a reasonable jury could not find that the harassing conduct alleged was frequent and severe." The district court explained that not all of the employees shared the same supervisor, worked in the same department, or were employed during the same time periods. As a result, the district court evaluated each claim of a hostile work environment based on "the specificity and quantity of evidence presented by each plaintiff." And the district court considered whether each employee had been *aware* of the harassment; the district court ruled that each employee could not use evidence of racial misconduct to prove that his hostile work environment was objectively hostile if the employee had been unaware of that misconduct.

Before the trial of Frederick Carter's and Sidney Hedgeman's claims of a racially hostile work environment, Austal filed a motion in limine to exclude "me too" testimony about other employees. The district court limited Carter's and Hedgeman's evidence to incidents of which at least one of them was aware. Carter

5

and Hedgeman moved to alter or amend that ruling, but the district court denied the motion and explained that its order was only preliminary. During trial, the district court revisited its preliminary ruling and allowed Carter and Hedgeman to present evidence of racial harassment by any of their supervisors against other employees.

The district court used the 2005 Eleventh Circuit Pattern Jury Instructions to explain as follows the difference between liability premised on a supervisor's actions and liability premised on a coworker's actions:

> [W]hen a hostile or abusive work environment is created by the conduct of a supervisor with immediate or successively higher authority over the Plaintiff, the Defendant employer is responsible under the law for such behavior and the resulting work environment.
>
> When a hostile or abusive work environment is created and carried on by the non-supervisory fellow co-workers of the Plaintiff, the Defendant, as the Plaintiff's employer, will be responsible or liable for permitting such behavior only if the Plaintiff proves by a preponderance of the evidence that the Plaintiff's supervisor or successively higher authority knew, that is, had actual knowledge, or should have known, that is, had constructive knowledge, of the hostile or abusive work environment and permitted it to continue by failing to take remedial action.
>
> To find that a supervisor had constructive knowledge of a hostile or abusive work environment, that is, that the supervisor should have known of such environment, the Plaintiff must prove that the hostile or abusive environment was so pervasive and so open and obvious that any reasonable person in the supervisor's position would have known the harassment was occurring. Even though you may have already determined that the Plaintiff was, in fact, exposed to a hostile or abusive work environment, that alone is not determinative of the issue of the supervisor's knowledge; rather, you must find that

6

discriminatory harassment to which the Plaintiff was exposed was so pervasive and unconcealed that knowledge on the part of the supervisor may be inferred.

The district court also instructed the jury as follows that an employee must be aware of an incident of racial misconduct to rely upon it as proof of a hostile work environment:

> As to the claim of hostile work environment, each Plaintiff must show that he was aware of the incidents, that is, the racial comments or the conduct, at the time he was employed at Austal. If a Plaintiff cannot show that he was aware of the incidents when he was employed, he cannot rely on that evidence to support his case, and it cannot be considered by you as part of that Plaintiff's claim against Austal.

And the district court instructed the jury as follows that each claim must be decided separately:

> When more than one claim is involved and when more than one defense is asserted, you should consider each claim and each defense separately, but in deciding whether any fact has been proved by a preponderance of the evidence, you may consider the testimony of all the witnesses, regardless of who may have called them, and of all the exhibits received in evidence, regardless of who may have produced them.
> . . .
> [But], even though five Plaintiffs are in trial together, when you consider the Plaintiffs' claims, you must consider them individually.

The jury returned verdicts against Hedgeman's and Carter's claims of a hostile work environment, and the district court denied their motions for judgments as a matter of law.

7

The 13 employees appeal the summary judgments, and Carter and Hedgeman appeal the jury verdicts. After the parties submitted their briefs in this appeal, Austal filed two motions. In the first motion, Austal asked our Court to supplement the record with the employees' initial disclosures. In the second motion, Austal asked us to strike the employees' expanded record excerpts, which included portions of depositions that they did not submit to the district court.

## II. STANDARDS OF REVIEW

"We review *de novo* a district court's grant of summary judgment and draw all inferences and review all evidence in the light most favorable to the non-moving party." *Hamilton*, 680 F.3d at 1318 (internal quotation marks omitted). A court should grant summary judgment only if the movant establishes that there is no genuine dispute as to any material fact. *Id.*

We review evidentiary rulings for an abuse of discretion. *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1305 (11th Cir. 1999). "An abuse of discretion occurs where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *United States v. Jayyousi*, 657 F.3d 1085, 1113 (11th Cir. 2011) (internal quotation marks omitted). "We overturn evidentiary rulings only when the moving party has proved a substantial prejudicial effect." *Judd v. Rodman*, 105 F.3d 1339, 1341 (11th Cir.

8

1997); *see Perry v. State Farm Fire & Cas. Co.*, 734 F.2d 1441, 1446 (11th Cir. 1984) (explaining that errors in evidentiary rulings are "harmless if it does not affect the substantial rights of the parties").

"We review jury instructions *de novo* to determine whether they misstate the law or mislead the jury to the prejudice of the party who objects to them." *United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008). "If the trial judge's instructions accurately reflect the law, he or she is given wide discretion as to the style and wording employed in its instruction." *McCormick v. Aderholt*, 293 F.3d 1254, 1260 (11th Cir. 2002). Under this deferential standard, we examine "whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." *Roberts & Schaefer Co. v. Hardaway Co.*, 152 F.3d 1283, 1295 (11th Cir. 1998). We will not reverse the district court unless we are "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Id.*

## III. DISCUSSION

We divide our discussion in two parts. First, we discuss whether the district court erred when it granted summary judgment against 13 employees on their claims of a racially hostile work environment. Second, we discuss whether the

9

district court abused its discretion in its evidentiary rulings and correctly stated the

law when it instructed the jury in Carter and Hedgeman's trial.

*A. The District Court Erred When It Granted Summary Judgment Against Hollis, Reed, Pettibone, Law, Bumpers, Williams, and Laffiette, but Correctly Granted Summary Judgment Against the Other Six Employees.*

To establish a claim of a hostile work environment, an employee must prove

that "the workplace is permeated with discriminatory intimidation, ridicule, and

insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." *Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993). The employee must prove five

elements if he bases his harassment claim on race: (1) that he is a member of a

protected class; (2) that he was subjected to unwelcome racial harassment; (3) that

the harassment was based on his race; (4) that the harassment was severe or

pervasive enough to alter the terms and conditions of his employment and create a

discriminatorily abusive working environment; and (5) that the employer is

responsible for the environment under a theory of either vicarious or direct

liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Austal conceded the first three elements for the purposes of summary

judgment and argued that the undisputed facts concerning the fourth and fifth

elements entitled it to summary judgment. The fourth element requires a plaintiff

10

to prove that the work environment is both subjectively and objectively hostile. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, . . . [and] 'the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 532 U.S. 75, 81, 118 S. Ct. 998, 1003 (1998)). The fifth element requires a plaintiff to prove that the employer is responsible for the hostile work environment because of actions taken by either a supervisor or a coworker. *Miller*, 277 F.3d at 1278. In the 13 orders granting summary judgment to Austal, the district court found that each employee subjectively perceived the harassment as sufficiently severe and persuasive, but that the work environment was not objectively hostile. Because it resolved all the summary judgments on the fourth element, the district court did not address whether Austal was responsible for the hostile work environment.

The 13 employees against whom summary judgment was entered argue that the district court erred in three ways when it ruled that the work environment at Austal was not objectively hostile. First, the employees argue that the district court erred by considering whether the work environment was objectively offensive as to

11

a Caucasian employee instead of an African-American employee. Second, the employees argue that the district court erred by failing to consider evidence of racial harassment of which the individual employees were unaware. Third, the employees argue that the record contains genuine disputes of material facts that the district court should have submitted to the jury. We discuss each argument in turn.

1. The District Court Applied the Correct Standard for a Reasonable Person.

The district court applied the correct standard for a reasonable person when it explained that the harassment must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceived to be abusive. The district court ruled that the record established that 13 of the employees subjectively believed the work environment at Austal was abusive, but that these 13 employees failed to establish that a reasonable person in each of their positions would also find the environment abusive. The employees argue that, because the district court determined that the remaining 10 employees satisfied the objective component, it was inconsistent to hold that the 13 employees failed to establish the objective component. But the district court correctly recognized that the employees worked in different departments for different supervisors at different times. And, as Austal argues, the employees point to nothing in the record to suggest, or even hint, that the district

12

court evaluated the objective component of their claims based on the perspective of a "Caucasian in Mobile, Alabama," as the 13 employees assert in their brief.

### 2. The District Court Correctly Considered Only Evidence About Which the Individual Employees Were Aware.

The district court also correctly limited its consideration to incidents of racial harassment of which the individual employees were aware. The 13 employees argue that the district court erred in failing to consider all incidents, even those they did not know about, in evaluating the objective component of their claims. Our precedents direct district "courts [to] examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Mendoza*, 195 F.3d at 1246. The totality of a plaintiff's workplace circumstances does not include other employees' experiences of which the plaintiff is unaware. Courts conduct the objective assessment from the perspective of a reasonable person in the plaintiff's position, knowing what the plaintiff knew. *Id.* A reasonable person in the plaintiff's position is not one who knows what the plaintiff learned only after her employment ended or what discovery later revealed.

Other circuits follow this approach. *See Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000) ("Harassment directed towards others of which an

13

employee is unaware can, naturally, have no bearing on whether she reasonably considered her working environment abusive."); *see also Cottrill v. MFA, Inc.*, 443 F.3d 629, 637 (8th Cir. 2006) ("We first consider Cottrill's hostile work environment claim. Cottrill was not aware of the peeping [tom], . . . [so] Cottrill may not rely on the peeping to establish that her work environment was hostile."); *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 978 (7th Cir. 2000) ("Insofar as Woodford harassed other employees, and did so without (so far as appears) [plaintiff's] knowledge, it could not have altered *her* conditions of employment, and so she could not complain about that harassment under Title VII."); *Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000) (holding that evidence that the plaintiff's coworkers experienced harassment was "irrelevant at this stage to plaintiff's hostile work environment claim because there is no evidence that plaintiff was aware of these actions at the time." (internal quotation mark and alterations omitted)); *Hirase-Doi v. U.S. W. Commc'ns, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995) ("US West correctly asserts that Doi may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment."). We agree with these courts that a district court should not consider evidence of racial harassment of other employees—evidence that the plaintiff did not know about—in evaluating the

14

objective component of a claim of a hostile work environment.

### 3. The Record Presents Genuine Disputes of Material Facts Only for Hollis, Reed, Pettibone, Law, Bumpers, Williams, and Laffiete.

The 13 employees argue that the district court erred when it ruled that the record does not contain genuine disputes of material fact concerning whether the work environment was objectively hostile. To evaluate whether a work environment is objectively hostile, we consider four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. In the light of these factors, we ask whether, under the totality of the circumstances, a reasonable person would find the harassing conduct severe or pervasive to alter the terms or conditions of the plaintiff's employment. *Id.*

Our decision in *Jones v. UPS Ground Freight* is instructive. In that case, we ruled that a truck driver established a genuine dispute of material fact about whether harassing conduct at his workplace created an objectively hostile work environment. 683 F.3d 1283 (11th Cir. 2012). The truck driver, who was African American, had presented evidence that a coworker told him, "I know how to train you Indians." *Id.* at 1288. When the driver replied that he was not Indian, the coworker said, "I don't care what race you are, I trained your kind before." *Id.* He

15

also presented evidence that people were leaving banana peels on his truck to harass him, that employees were wearing Confederate apparel around the worksite, and that two coworkers approached him at night with a crowbar to ask if he had reported to their manager the banana peels and Confederate apparel. *Id.* at 1289–90. We reversed a summary judgment against the driver and ruled that he had presented a disputed issue of material fact concerning whether his work environment was objectively hostile. *Id.* at 1304.

When we apply the four factors that govern whether a work environment is objectively hostile and compare the harassment experienced by the employees at Austal to the harassment experienced by the truck driver in *Jones*, we conclude that several of the employees presented sufficient evidence of an objectively hostile work environment. The record presents genuine disputes of material facts about whether the work environments of Hollis, Reed, Pettibone, Law, Bumpers, Williams, and Laffiete were objectively hostile, but the record presents no genuine dispute of material facts as to Adams, Cunningham, Pratt, Slay, Sullivan, and Thomas.

We deny as moot the motion filed by Austal to strike the employees' expanded record excerpts. To evaluate each employee's claim, we rely only on the evidence that the employee or Austal submitted to the district court at summary

16

judgment, and we do not consider evidence from the expanded record excerpts not submitted to the district court.

### a.  Tesha Hollis

The record presents a genuine dispute of material facts that Hollis's workplace was objectively hostile. In the three years that she worked at Austal, she discovered a noose in the breakroom and another noose that someone had hung on one of the ships. Her supervisor pretended to masturbate in front of her while telling her that a racist and perverse drawing of her appeared in the men's restroom, and she saw the drawing in the men's restroom. The caption to the drawing stated, "[Y]'all got a bad ass nigger bitch working over here . . . . [A] white man like me would love to split that dark oak." Hollis also heard white employees, most of whom were supervisors, call black employees "boy" on "many" occasions, and she once heard someone say over the work walky-talky system, "[S]end some monkeys over here." She observed a white employee, who called black employees "boy" and "monkey," kick a black employee. And "every morning" she saw white employees on her crew wear clothing and accessories with the Confederate flag.

Hollis raises a disputed issue that the harassment she experienced was frequent, severe, and humiliating. The racist graffiti in the men's restroom depicted

17

her, the caption included a threatening and humiliating racial slur, and her supervisor told her about the drawing while pretending to masturbate. She discovered the noose in the breakroom, which a reasonable person could find threatening. She also frequently heard white employees call black employees "boy," and she saw a Confederate flag every morning. A reasonable jury could find that her workplace was objectively hostile.

### b.  Nathaniel Reed

The record also presents a genuine dispute of material facts that Reed's work environment was objectively hostile. Reed worked for Austal for two and a half years, during which he heard racial slurs and saw racist graffiti in the men's restrooms "every[ ]day." He "could not use the restroom without seeing a racial slur or remark on the wall," and "every now and then," he saw racist graffiti, such as "I hate niggers," on a boat that he helped build. His supervisor, who is white, called him "boy" on "several" occasions. *See Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 897 (11th Cir. 2011) ("[T]he decision maker[] used the word 'boy' in a racially demeaning way."). Reed also saw Austal employees, including supervisors, wear apparel with Confederate flags "every day." And he learned that a white coworker called a black coworker a "black bitch."

18

Reed raises a disputed issue that the harassment he experienced was frequent and severe. Even though Austal cleaned the racist graffiti regularly, it filled the walls of the restroom that he used daily, and he also saw racist graffiti on the ship where he worked. He also heard racial slurs every day and saw employees and supervisors wear Confederate flags every day. And his supervisor called him "boy" on "several" occasions. A reasonable jury could find that his workplace was objectively hostile.

### c. Jerome Pettibone

The record also presents a genuine dispute of material facts that Pettibone's work environment was objectively hostile. Pettibone worked for Austal for over three years, during which he saw racist graffiti in the bathroom on multiple occasions, saw Confederate flags displayed by multiple coworkers "all through the building," and saw a drawing of a hangman with the caption "niggers." Pettibone was one of the employees who discovered the noose in the breakroom, and his coworkers accused him of hanging it. He also heard secondhand about other nooses and racial slurs. One of the slurs was made by his supervisor, who had said, "[Y]ou can get a lot of free slavery . . . . A lot of hard work with cheap slave labor done." And he heard about another white supervisor kicking two black employees.

19

Pettibone raises a disputed issue that the harassment he experienced was frequent and severe. Although Austal regularly removed the racist graffiti, he saw it frequently. He also frequently saw coworkers wearing the Confederate flag. The noose that he discovered and the stick figure with the noose and the caption "niggers" was severe, especially because he saw them both firsthand. And the slur by his supervisor, although not directed toward Pettibone, related directly to work at Austal by black employees. A reasonable jury could find that his workplace was objectively hostile.

### d.  Ron Law

The record presents a genuine dispute of material facts that Law's work environment was objectively hostile. Law worked at Austal for two and a half years, during which he observed racially harassing conduct firsthand. He regularly saw racist graffiti in the men's restrooms, and he also saw racial slurs written in the aluminum on the ship where he worked. He was one of the employees who saw the noose in the breakroom, and he heard about two other nooses. He saw a stick figure with a noose around its neck with the slur "nigger" written on it, and he heard from a coworker that a supervisor was "climbing around like a monkey through the boat" and "making monkey sounds." He also saw a coworker wear a shirt and belt buckle with the Confederate flag, but only twice. Law heard a

20

supervisor request over the work walky-talky that someone "send him some monkeys" to help lift heavy items in the shipyard. And he heard a white employee say that "where he [is] from, they hang . . . niggers."

Law raises a disputed issue that the harassment he experienced was frequent and severe. Like Pettibone, he frequently saw racist graffiti in the men's restroom, he discovered the noose in the breakroom, and he saw the stick figure with a noose around its neck and the caption "niggers." Law also saw racist graffiti on the ship where he worked, heard a supervisor request "monkeys" over the walky-talky, and heard a coworker talk about hanging niggers. A reasonable jury could find that his workplace was objectively hostile.

### e.  Nelson Bumpers

The record presents a genuine dispute of material facts that Bumpers's work environment was objectively hostile. Bumpers worked for Austal for five and a half years. He saw racist graffiti "all the time" when he used the men's restrooms, and he saw his white coworkers wear shirts with Confederate flag apparel "numerous times." He also twice heard his supervisor call black people "blue gums." *See, e.g.*, *Sherpell v. Humnoke Sch. Dist. No. 5*, 619 F. Supp. 670, 678 (E.D. Ark. 1985) (recognizing "blue-gums" as a racial slur). The second time, the supervisor approached him directly and asked if he knew that "there was a tree

21

called blue gum." Bumpers was aware of the noose in the breakroom, but was not one of the employees who discovered it.

Bumpers raises a disputed issue that the harassment he experienced was frequent, severe, and humiliating. He frequently saw the racist graffiti in the men's restrooms and also frequently saw white employees wearing a Confederate flag shirt. He also heard his supervisor call black people "blue gums," and his supervisor asked him specifically about the derogatory term. That harassment, although infrequent, was severe and humiliating. He heard about the noose, which is a severe form of racial harassment, but his experience was less severe because he did not see it firsthand. Although it is a closer question than Hollis, Reed, Pettibone, and Law, a reasonable jury could find that his work environment was objectively hostile.

### f.  Frederick Williams

The record presents a genuine dispute of material facts that Williams's work environment was objectively hostile. Williams worked for Austal for about a year, during which no one ever "verbally" said anything racist to him and no Caucasian employee ever used the slur "nigger" around him. But he saw one coworker wear a shirt with a Confederate flag and regularly saw racist graffiti in the men's restroom. He reported the racist graffiti to his supervisor, who told Williams that

22

"it's always been like that and if [he] didn't like it [he could] quit." Williams was working on part of a ship with his supervisor, who carved the slur "porch monkeys" into the aluminum; Williams "questioned" his supervisor about the slur, and the supervisor then "sanded it off." And on the day that Williams quit his job at Austal, which was after he had filed his discrimination claim, his supervisor "got in [his] face, less than an inch from [his] lips, screaming and hollering" and told him that "he wasn't a goddamn racist."

Williams raises a disputed issue that the harassment he experienced was frequent and severe. Although his exposure to the Confederate flag was limited, he saw the racist graffiti in the men's restroom regularly. And like Bumpers, his supervisor humiliated him with a racial slur. Although his supervisor's carving was an isolated act, it was severe. A reasonable jury could find that Williams's work environment was objectively hostile.

### g.  Larry Laffiette

The record presents a genuine dispute of material facts that Laffiette's workplace was objectively hostile. He worked for Austal for roughly three years, during which he thought he heard a coworker once say to him, "Where you been at, nigger?" but he "couldn't really make out" what was said and he "wasn't sure" if the coworker said the slur "nigger." His supervisor called him "boy" "all the

23

time," which he clarified was "over ten times." Two other coworkers called him "boy," "over ten times" and "over 50 times," respectively. He saw racist graffiti "all the time" in "pretty much all of" the restrooms that he used at work. He also saw several employees wear apparel with the Confederate flag, although "none of them worked on [his] crew." And his coworker showed him a photograph of a noose in the breakroom.

Laffiette raises a disputed issue that the harassment he experienced was frequent and severe. Laffiette frequently experienced racial harassment by his supervisor's and coworkers' references to "boy," and he also frequently saw racist graffiti in the men's restrooms. And the photograph of the noose was severe, but less severe than if he had discovered the noose firsthand. Because of the frequency with which he was called "boy" and saw the racist graffiti, combined with the other harassment of which he learned secondhand, a reasonable jury could find that his workplace was objectively hostile.

### h.  Robert Adams

Unlike the previous employees, the record does not present a genuine dispute of material facts concerning Adams's work environment. Adams worked for Austal for two years. He saw his coworkers wear the Confederate flag on a regular basis, and he saw racist graffiti in the men's restroom that he used on a

24

daily basis. Otherwise, the racial harassment he experienced was isolated. He heard people say the slur "nigger," but only a "few times" over two years, and he heard about the noose in the breakroom, although he did not see it himself.

Adams failed to establish a disputed issue concerning his work environment. Like many of the employees, Adams frequently saw the racist graffiti in the men's restrooms and frequently saw the Confederate flag. But Austal regularly cleaned the graffiti, and Law's exposure to the Confederate flag was not directly humiliating or threatening. As to the slur "nigger," he heard it only a few times over several years, and he did not offer evidence that a supervisor used the word or that anyone directed it toward him. And he did not see the noose in the breakroom. Considering the totality of the circumstances, a reasonable jury would not find that his workplace was objectively hostile.

### i.   Alvin Cunningham

The record also does not present a genuine dispute of material facts concerning Cunningham's work environment. Cunningham worked for Austal for eight months, during which he heard a white coworker say "nigger" and heard a supervisor say "nigger" in front of him, but the slurs were not directed at him and he did not work for the supervisor or remember his name. He once saw a Confederate flag, and an employee showed him a photograph of nooses while

25

smiling, but that employee "never engage[d] in th[at] type of behavior" after Cunningham reported it, and that employee later became "somewhat [his] best friend." He also saw the graffiti in the men's restrooms, but he did not remember any specifics.

Cunningham fails to raise a disputed issue concerning his work environment. The racial harassment experienced by Cunningham was not frequent, and although the use of the slur "nigger" is severe, it was not directed toward him or directly humiliating or threatening to him. Cunningham could not recall any specifics about the graffiti in the restroom. The other incidents of harassment were not directed toward him, were not made by his supervisor, and he did not experience them firsthand. A reasonable person would not find that his work environment was hostile.

### j.   Rahman Pratt

The record does not present a genuine dispute of material facts concerning Pratt's work environment. Pratt worked for Austal for seven months, during which "no white employee made a racially discriminatory comment directly toward" him, but he heard "little comments being made . . . about black people, in general." He once overheard a white coworker, talking to other white coworkers, say that "h[e] and a nigger got into it" and that he would "hang that nigger, and shoot that

26

nigger." That employee also called black people "monkeys" during the conversation. He heard about comments from other coworkers and saw several employees wear apparel with the Confederate flag. He also saw racist graffiti in the men's restrooms and complained about it several times.

Pratt fails to establish a disputed issue of material facts concerning his work environment. The racist graffiti in the bathroom was frequent, but Austal regularly cleaned it and none of the drawings targeted him specifically. He frequently saw employees wear apparel with the Confederate flag, but his exposure to the symbol was not humiliating or threatening. The racist conversation that he overheard was isolated and not directly threatening or humiliating to him. Considering the totality of the circumstances, a reasonable jury would not find that his workplace was objectively hostile.

### k.  Carolyn Slay

The record does not present a genuine dispute of material facts concerning Slay's work environment. Slay worked at Austal for three and a half years, during which no one directed racist comments at her personally. But she saw racist graffiti on boxes that were in the women's restroom, which said, "We don't want to get any nasty black and lazy people." Austal removed the boxes after a month and the graffiti stopped. She heard someone ask to "send over the monkeys" on the walky-

27

talky. And she saw a toolbox with the phrase "don't feed the monkeys." She also saw Confederate flags "[e]very day."

Slay learned about additional incidents of racial harassment from her coworkers. Her coworker showed her photographs of racist graffiti in the men's restroom at least every week, she heard that white supervisors had complained in a human resources meeting about Austal hiring black people, she saw a photograph of the stick figure with a noose, she heard about the noose in the breakroom, and she heard that a supervisor was harassing her black coworkers. She also stated in her deposition that people vandalized her wielding machines, but she did not introduce any evidence that the vandalism was related to her race.

Slay fails to establish a disputed issue of material facts concerning her work environment. She frequently saw coworkers wearing apparel with the Confederate flag, which did not directly humiliate or threaten her. The only other harassment she experienced firsthand was not pervasive or severe: She saw racist graffiti on boxes in the women's restroom, but it did not cover the walls, like the graffiti in the men's restroom. And the racial slur on the toolbox and the statement over the walky-talky were isolated incidents that did not involve her directly. All of the other harassment she learned about from other people. Even though others sent her photographs of the graffiti in the men's restroom "at least every week," she

28

willingly accepted the photographs and did not ask that they stop or tell the senders that she felt harassed by them. Considering the totality of the circumstances, a reasonable jury would not find that her workplace was objectively hostile.

## l.  Gloria Sullivan

The record does not present a genuine dispute of material facts concerning Sullivan's work environment. Sullivan worked at Austal for more than five years, during which she once heard someone call her coworker "Darth Vader" and once saw a stick figure of one of her black coworkers with a noose around the neck of the figure. She heard a coworker use the slur "nigger," but she explained that she thought the person said it "[m]aybe in a joking manner," it was "not an everyday thing," and she "c[ould]n't recall" who said it. She was also "told by other employees" that another employee "used the 'N' word" around Austal. She heard secondhand that her coworker had seen apparel with a Confederate flag on it and that employees had discovered three nooses at the workplace. She also once heard a white employee call a black employee "boy," and she stated that she heard the word "boy" "[t]hroughout" her time at Austal, but she "c[ould]n't recall" who said it. And she saw cell phone photographs of "a lot of" the racist graffiti in the men's restrooms, but she could not "recall exactly what it was."

29

Sullivan fails to raise a disputed issue concerning her work environment. The harassment suffered by Sullivan was not frequent, she heard about most of it secondhand, and the harassment never threatened her or humiliated her. And although she saw "a lot of" the racist graffiti in the men's restrooms, she saw it because she willingly viewed photographs that her coworkers sent her, which is significantly less severe than the experience of an employee who must view the racist graffiti if he wants to use the restroom. She also did not personally see the noose, but learned about it from other people. And she heard white employees call black employees "boy," but no one called her that name and she did not sufficiently establish that she heard the slur frequently. A reasonable jury would not find that her work environment was objectively hostile.

### m. Franklin Thomas

The record does not present a genuine dispute of material facts concerning Thomas's work environment. He worked at Austal for five and a half years, during which he "saw a lot" of racist graffiti in two of the men's restrooms and saw white employees' paraphernalia with the Confederate flag. He also experienced three specific instances of racial harassment: His white supervisor said to him, "Hey, Frank, I told you I'm not racist[;] at home I have a color TV." Thomas heard a coworker say that when he got home "he was going to beat that nigger ass." And a

30

coworker once called him "boy." Thomas talked to all three people after their comments, and they never made racist comments to him again.

Thomas fails to raise a disputed issue concerning his work environment. Although he "saw a lot" of racist graffiti and the other incidents of racial harassment were offensive, the harassment he experienced was not pervasive or severe. And the comments he overheard were isolated and did not directly threaten or humiliate him. A reasonable jury would not find that his workplace was objectively hostile.

\* \* \*

In the light of these facts, we vacate the summary judgments against Hollis, Reed, Pettibone, Law, Bumpers, Williams, and Laffiete, and we remand their claims of a racially hostile work environment to the district court to determine whether Austal is entitled to summary judgment on the ground that it was not directly or vicariously liable for the harassment or whether the employees' claims should proceed to trial. We affirm the summary judgments against the other six employees.

*B. In Hedgeman and Carter's Trial, the District Court Did Not Abuse Its Discretion in Its Evidentiary Rulings and Correctly Stated the Law to the Jury.*

We divide our discussion of the issues raised on appeal related to the jury verdicts against Hedgeman and Carter in three parts. First, we explain why the

31

district court did not abuse its discretion when it excluded some "me too" evidence and permitted Austal to present evidence in support of a *Faragher* defense. Second, we explain why the district court correctly stated the law when it instructed the jury. Third, we explain why Hedgeman and Carter waived their remaining claims.

### 1. The District Court Did Not Abuse Its Discretion When It Excluded "Me Too" Evidence and Permitted Austal to Raise a *Faragher* Defense.

Hedgeman and Carter argue that the district court erred when it excluded "me too" evidence, permitted Austal to raise an untimely *Faragher* defense, and permitted Austal to call undisclosed witnesses. These arguments fail. We address each in turn.

### a. Exclusion of "Me Too" Evidence

Neither our Circuit nor the Supreme Court has clearly defined the outer bounds of admitting "me too" evidence to prove that an employer should be held liable for a hostile work environment. We have allowed, as relevant and not overly prejudicial, the admission of evidence of racial slurs that an employee did not hear and epithets not directed at the employee, *Busby v. City of Orlando*, 931 F.3d 764, 785 (11th Cir. 1991), but we have not held that "me too" evidence about slurs of which the employee was unaware can prove that the employee viewed his work environment as hostile, *cf. Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522

32

(11th Cir. 1995) ("[S]ome of the incidents relied upon were not made known to Edwards until after her termination and, therefore, could not have contributed to her *subjective* view of a hostile work environment." (emphasis added)). In *Bagby Elevator Co.*, we affirmed the admission of "me too" evidence under Federal Rule of Evidence 402, to support a claim of a hostile work environment because the evidence proved that the employer, a small business, permitted the hostile environment to exist and the evidence was relevant to issues raised either on cross-examination or as an affirmative defense. 513 F.3d at 1286. But we did not address whether the plaintiff was aware of the "me too" evidence.

Even when "me too" evidence is relevant under Rule 401, the district court retains the discretion to exclude that evidence, under Rule 403, if it is unduly prejudicial, confusing, misleading, or cumulative. In *Sprint/United Management Co. v. Mendelsohn*, the Supreme Court explained that the admissibility of evidence of discrimination by other supervisors is not governed by a categorical rule, but is a "fact-intensive, context-specific inquiry." 552 U.S. 379, 388, 128 S. Ct. 1140, 1147 (2008). For example, unlike the small company in *Bagby Elevator*, Austal employs over 2,000 workers across many departments and in different locations. The response in one department or from one supervisor might vary greatly from

33

another department or supervisor, and the decision to admit "me too" evidence rests within the sound discretion of the district court under Rules 401 and 403.

The district court did not abuse its discretion when it excluded the "me too" evidence proffered by Hedgeman and Carter during their case in chief. During trial, the district court admitted evidence of racial harassment by any supervisor of the employee plaintiffs. The district court did not abuse its discretion by excluding evidence about incidents of harassment of which Hedgeman and Carter were unaware and that were unrelated to their supervisors. And Hedgeman and Carter have failed to explain the substantial prejudice they suffered by the exclusion of that evidence.

Although "me too" evidence of which a plaintiff is unaware is admissible in rebuttal to prove the ineffectiveness of an antiharassment policy, *see Bagby Elevator*, 513 F.3d at 1286–87, Hedgeman and Carter failed to proffer any "me too" evidence in rebuttal. Indeed, they offered no rebuttal evidence. The district court could not have abused its discretion by excluding evidence that Hedgeman and Carter never proffered.

### b. *Faragher* Defense

An employer can avoid liability for a hostile work environment by maintaining an effective policy against harassment by a supervisor or coworker of

34

the complaining employee. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293 (1998). The *Faragher* defense has two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*   For harassment by a coworker, "the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action." *Miller*, 277 F.3d at 1278. An employee who complains about harassment by a coworker must prove either actual or constructive knowledge of the employer. *Id.*

The district court did not abuse its discretion when it permitted Austal to present evidence in support of a *Faragher* defense at trial. Although Austal failed to mention the term *Faragher* in its answer to the complaint, Austal raised a generic defense that the plaintiffs "failed to mitigate their damages." That pleading of "failure to mitigate" sufficiently raised a *Faragher* defense. Austal later argued the *Faragher* defense in its motions for summary judgment, and Hedgeman and Carter responded to the *Faragher* defense on the merits. The district court also provided preliminary jury instructions on the *Faragher* defense before trial. Any failure by Austal to comply with Federal Rule of Civil Procedure 8(c) did not

35

cause Hedgeman and Carter any prejudice. *See Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir. 1989).

### c. Undisclosed Witnesses

Lastly, Hedgeman and Carter argued that the district court abused its discretion by permitting Austal to call undisclosed witnesses, but they waived this argument because they failed to explain how the testimony of these witnesses prejudiced them. The burden to prove that an evidentiary ruling was an abuse of discretion and caused substantial prejudice lies with the objecting party. *Judd*, 105 F.3d at 1341. Hedgeman and Carter's failure to do so waives such an argument. Accordingly, we deny as moot the motion filed by Austal to supplement the record with the employees' initial disclosures, which listed the allegedly undisclosed witnesses.

2.  The District Court Correctly Stated the Law When It Instructed the Jury.

Hedgeman and Carter argue that the district court misstated the law in three ways when it gave preliminary and final jury instructions: (1) it confused supervisor and coworker harassment and the elements of each kind of claim; (2) it misstated the law by instructing the jury to consider only acts which each plaintiff was aware; and (3) it incorrectly instructed the jury to consider each employee's claim separately. After instructing the jury on the basic elements of a claim of a

hostile work environment, the district court provided a full definition for both supervisory liability and coworker liability that mirrored the 2005 Eleventh Circuit Pattern Jury Instruction, which accurately reflects the difference between supervisor and coworker liability. Hedgeman and Carter fail to identify the inaccuracies in the definitions of supervisor and coworker liabilities provided by the district court, and we find none. The district court also correctly instructed the jury that an employee must be aware of the incidents of harassment that would support the subjective and objective components for a claim of a hostile work environment. And the instruction to consider each claim separately properly informed the jury to evaluate each employee's claim individually.

### 3. Hedgeman and Carter Waived their Remaining Claims.

In their brief, Hedgeman and Carter argue about the denial of their *Batson* challenges and, in their notice of appeal, they represent that they are appealing the jury verdicts and final judgments entered against them, but they have waived these arguments. Hedgeman and Carter failed to submit the transcript of the jury selection in a timely manner, so we cannot review their *Batson* challenges. "Under the 'absence equals affirmance rule,' the burden is on the appellant to ensure the record on appeal is complete, and where a failure to discharge that burden prevents us from reviewing the district court's decision we ordinarily will affirm the

37

judgment." *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1224 (11th Cir. 2012) (internal quotation marks omitted). Hedgeman and Carter also failed to address in their initial brief why the jury verdict and the denial of their motion for judgment as a matter of law were clearly erroneous. Those issues are now waived. *See Mesa Air Grp., Inc. v. Delta Air Lines, Inc.*, 573 F.3d 1124, 1130 n.7 (11th Cir. 2009).

## IV. CONCLUSION

We **AFFIRM** the summary judgments in favor of Austal and against Robert Adams, Alvin Cunningham, Rahman Pratt, Carolyn Slay, Gloria Sullivan, and Franklin Thomas. We **VACATE** the summary judgments in favor of Austal and against Tesha Hollis, Nathaniel Reed, Jerome Pettibone, Ron Law, Nelson Bumpers, Frederick Williams, and Larry Laffiette and **REMAND** for further proceedings. We **AFFIRM** the judgments in favor of Austal and against Frederick A. Carter and Sidney Hedgeman. We **DENY** as moot the motion filed by Austal to supplement the record with the employees' initial disclosures. And we **DENY** as moot the motion filed by Austal to strike the employees' expanded record excerpts.

38