[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17773
Non-Argument Calendar

_____

D.C. Docket No. 3:15-cv-00244-MCR-CJK

JOSEPH L. COOLER,

Plaintiff-Appellant,

versus

LAYNE CHRISTENSEN COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(October 10, 2017)

Before MARCUS, MARTIN, and FAY, Circuit Judges.

PER CURIAM:

Joseph Cooler appeals the district court's grant of summary judgment in

favor of Layne Christensen Company in his retaliation, race discrimination, and

hostile work environment suit brought under 42 U.S.C § 1981 and Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e.  After careful review, we affirm the grant of summary judgment as to his retaliation and race discrimination claims, and reverse and remand as to his hostile work environment claim.

## I.

## A.

In June 2013, Cooler, an African American man, began working at Layne's Pensacola, Florida, location as a driller helper.  To support his claims, Cooler described a number of events during which his supervisors and coworkers subjected him to racial harassment.

Eric Joiner,[1] a white man, was Cooler's supervisor at one project site.  When Cooler complained of overheating and cramps on a hot day, Eric told him to cool down in the toolshed—a hot metal container—instead of the air-conditioned truck.  During the time Cooler was in the shed, Eric and another white employee took a break and sat in the air-conditioned truck.  Cooler was eventually allowed in the truck, but it was too late—he had to be taken to the hospital and treated for dehydration.

---

[1] Cooler had two supervisors with the last name Joiner.  For clarity we refer to both by their first names.

2

Alpo Joiner, a white man, was Cooler's supervisor at another project site. Alpo would call Cooler "you people" or "boy," instead of saying his name.[2] One time, Alpo used the "N-word" while talking to Cooler.[3] Another of Cooler's white supervisors, Jonathan Godwin, also used the "N-word" while talking to Cooler. Both times the "N-word" was used, the supervisors did it while telling Cooler about a time they had received a disciplinary write-up for using the slur. Cooler felt that the only reason they would tell him this was to see how he would react to them using the "N-word."

When he was not working at project sites, Cooler worked at Layne's warehouse in Pensacola, where his supervisor was Kenneth Ratliff. Ratliff would sometimes delegate his authority to William Van Pelt. Both Ratliff and Van Pelt were white men. Cooler and Godwin each testified that Van Pelt was known to Layne employees as the "grand wizard" of the warehouse.[4] Cooler also testified that Van Pelt would refuse to speak directly with him, but would instead tell a white person what Cooler should do while Cooler stood there. In this regard,

---

[2] Cooler testified that Alpo also called white employees "boy" on occasion but mostly referred to them by name. Other white Layne employees, including Eric and Andy Armstrong, also called Cooler "boy."

[3] While Cooler used the term "N-word" when describing these episodes at his deposition, the reasonable inference is that both Alpo and Godwin used the word "nigger" in conversation with Cooler. See Peppers v. Cobb Cty., 835 F.3d 1289, 1295 (11th Cir. 2016).

[4] In his deposition, Godwin first said "numerous people" called Van Pelt the grand wizard, and then later said he only heard Leroy Watson and Bernard Witherspoon, two African American employees, doing so. However, Cooler also testified that Van Pelt said to him "you got a problem with [] me being the grand wizard?"

3

Godwin testified that Van Pelt generally refused to speak to any employees at Cooler's level, including, on occasion, white employees.[5]  Cooler said that the one time Van Pelt spoke to him, Van Pelt called him "you people" as well as "boy," and also let him know that black people were not welcome in the break room.  In that breakroom conversation, Van Pelt said to him "you people think you can come in here and do whatever you want."  Nevertheless, Cooler ate in the break room a few times, usually alone.  Cooler testified that he complained to other supervisors about Van Pelt's behavior, but they never addressed it.

Cooler also said he was subject to daily harassment.  White employees, including Eric, Alpo, and Dustin Lambert, made comments about Cooler's hair, which he wore in long braids.  They called him "sugar pants" and said to each other that "gays," "faggots," "sissies," and girls wore their hair in braids.  Cooler reported the gay slurs to his supervisors.  Cooler also saw confederate flag decals on Eric's and Lambert's cars.  In addition, Cooler felt he was given more degrading assignments than his white coworkers, including anything that would get him dirty.  Then, in October 2013, Cooler began dating a white woman, at which point his coworkers increased their hostile treatment of him.  Godwin told Cooler

---

[5] Watson testified that Van Pelt showed Watson his "KKK card."  Watson also testified that on another occasion, Van Pelt was reacting in the break room to a local murder and said: "That nigger came in there and killed that white woman. . . .  Them police should have give us that nigger like they used to give us them niggers, and we will hang that nigger."  The record is unclear as to when Cooler learned of these incidents.

4

directly that he was being mistreated because of his relationship with a white woman. Cooler reported the difference in work assignments and the "racial treatment" to his supervisors. Despite assurances that the supervisors would investigate, they never followed up with Cooler.

B.

From April 29 to May 1, 2014, Layne held a training in Baton Rouge, Louisiana, conducted by Don Lewison and Jason Little. Cooler attended the training at Layne's expense. On the final day, Cooler left training to pack his bags and check out of his hotel room. On his way out, he asked Lewison, who was also out of the room on a phone call, for permission to pack and take his luggage to his car. Lewison motioned for Cooler to go ahead. When Cooler returned, he met Little, who was looking for him. Little and Lewison thought Cooler had missed as much as forty minutes more than the ten to fifteen minutes allowed for breaks, and decided they could not certify him for the training. Cooler testified that he was away from the training for a total of twenty to twenty-five minutes.

Cooler then spoke with Darryl Ross, an African American man who was a manager at Layne. Ross submitted a declaration saying "Cooler refused to accept any responsibility for [his] misconduct, and refused to even acknowledge that his truancy was misconduct at all." Because Cooler "had wasted company time and resources" and did not accept responsibility for his conduct, Ross decided to fire

5

Cooler. Ross also filled out a Disciplinary Action Form, which said Cooler argued with the instructor when he returned from his break and that Cooler "seemed to have an excuse or challenge supervision" throughout his employment at Layne.[6]

Cooler filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC sent Cooler a letter granting him the right to sue. He filed suit against Layne, alleging, as relevant here: retaliation; race discrimination; and a hostile work environment, all under § 1981 and Title VII. Layne moved for summary judgment, which the district court granted. This appeal followed. We address Cooler's arguments as to each claim in turn.

## II.

We review de novo a district court's grant of summary judgment, "taking all of the facts in the record and drawing all reasonable inferences in the light most favorable to the non-moving party." Peppers, 835 F.3d at 1295. Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We will grant summary judgment if no "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

---

[6] Cooler says he did not argue with either Little or Lewison.

A.

To establish a claim of retaliation under § 1981, a plaintiff must show: (1) statutorily protected activity; (2) a materially adverse action; and (3) a causal link between the protected activity and the adverse action.[7] Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008). Cooler challenges the district court's finding that he failed to show the causal connection element required to make a retaliation claim. "We construe the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Id. at 1278 (quotation omitted). But when there is a substantial delay between the protected activity and the adverse action, a plaintiff must submit other evidence supporting causation to survive summary judgment. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam).

Cooler admits that his firing was not close in time to his protected activity. Instead, he argues he was fired at Layne's first opportunity to retaliate against him. Cooler explains that he was not disciplined in any way before the training, so missing part of the training was the first time Layne had any excuse to fire him. Cooler supports his "first opportunity" argument with a case from the Fourth Circuit. See Price v. Thompson, 380 F.3d 209 (4th Cir. 2004), abrogated on other

---

[7] The district court found Cooler abandoned his Title VII retaliation claim. Cooler does not challenge this finding, so we do not consider that claim.

7

grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. ___, 133 S. Ct. 2517

(2013). In Price, the plaintiff filed an EEOC complaint against the defendant after

not receiving a job, and six months later applied for another job with the defendant

without success. Id. at 211–12. In this "failure-to-hire context" the Fourth Circuit

assumed "the employer's knowledge [of the EEOC complaint] coupled with an

adverse action taken at the first opportunity satisfies the causal connection element

of the prima facie case." Id. at 213.

But we have very different facts here. In Price, until the plaintiff filed the

second job application, the defendant had no contact with the plaintiff, and thus no

way to retaliate against him. Here, Cooler was employed by Layne, giving Layne

a continuous opportunity to retaliate against him. And there is no record evidence

otherwise explaining the delay between Cooler's protected activity and the adverse

action.[8] Therefore, without other evidence tending to show causation, Cooler's

retaliation claim fails as a matter of law. See Thomas, 506 F.3d at 1364.

## B.

Cooler next argues he presented enough circumstantial evidence to support a

prima facie case of race discrimination. Cooler acknowledges that he did not

---

[8] Other circuits have found sufficient evidence to support a theory of first opportunity in the employment context, for example, where the retaliator had just assumed a position of power over the plaintiff. See Porter v. Cal. Dep't of Corr., 419 F.3d 885, 895 (9th Cir. 2005); Ford v. Gen. Motors Corp., 305 F.3d 545, 554–55 (6th Cir. 2002). However, this case does not present such facts.

identify a similarly situated employee that Layne treated better than him, so he cannot establish a prima facie case of employment discrimination under the burden shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).[9]  However, establishing the elements of the McDonnell Douglas framework is not the only way for a plaintiff to survive a summary judgment motion in an employment discrimination case.  Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  A plaintiff can still proceed past summary judgment if he "presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  Id. (quotation and footnote omitted).  Therefore, a plaintiff's failure to find similarly situated employees "does not necessarily doom [his] case." Id.

Cooler argues he provided evidence that he was ignored by the "grand wizard," Van Pelt; called "boy" and "you people" by his supervisors; and refused air conditioning when he was showing signs of heat exhaustion.  Cooler asserts

---

[9] "Racial discrimination claims based on circumstantial evidence are evaluated under the McDonnell Douglas burden shifting framework."  Burke-Fowler v. Orange Cty., 447 F.3d 1319, 1323 (11th Cir. 2006) (per curiam).  Under that framework, a plaintiff first needs to establish a prima facie case of discrimination.  Id.  A plaintiff can do this by showing "(1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004).  This analytical framework applies to both Title VII and § 1981 claims.  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

these actions resulted in his receiving more demeaning work assignments, as well as his being terminated for taking a long break at the training.

There are two reasons that Cooler's evidence does not "present[] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (quotation and footnote omitted). First, Ross, who made the decision to fire Cooler, committed none of the discriminatory acts. See Holifield v. Reno, 115 F.3d 1555, 1563–64 (11th Cir. 1997) (per curiam) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." (quotation omitted)). Second, Cooler's evidence is much weaker than that in Smith, where the plaintiff demonstrated a motive to discriminate, a number of incidents of white and black employees being treated differently, and the employer's conscious tracking of race in disciplinary decisions. Smith, 644 F.3d at 1329–46; see also Connelly v. Metro. Atlanta Rapid Transit Auth., 764 F.3d 1358, 1364–65 (11th Cir. 2014). Cooler's race discrimination claim therefore fails.

## C.

Cooler last argues that he presented enough evidence of severe and pervasive harassment to support his claim of a hostile work environment. Title VII and § 1981 are violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (quotations and citations omitted); Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).  To establish a hostile work environment claim based on race, a plaintiff must show:

> (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability.

Adams v. Austal, USA, LLC, 754 F.3d 1240, 1248–49 (11th Cir. 2014).

The district court found Cooler failed to show the fourth element.  The fourth element has both subjective and objective components.  Jones v. UPS Ground Freight, 683 F.3d 1283, 1299 (11th Cir. 2012).  At summary judgment, we accept that the plaintiff satisfied the subjective component, and review whether a reasonable person would perceive that the harassment was severe and pervasive enough to alter the terms of employment.  See id.  In doing so, we evaluate whether the discriminatory conduct was (1) frequent; (2) severe; (3) physically threatening or humiliating; and (4) an unreasonable interference to the employee's work.  Id.  We must consider the totality of circumstances in evaluating Cooler's claim.  Id. at 1302.  We "examine the conduct in context, not as isolated acts" and

11

include other employees' experiences that the plaintiff was aware of at the time. Adams, 754 F.3d at 1250 (quotation omitted).

Cooler presents the following evidence in support of his hostile workplace claim. Two of Cooler's supervisors used the word "nigger" while talking with him. While neither use of the word was directed at Cooler, Cooler felt that both supervisors told him about instances in which they had gotten in trouble for using the slur at work in order to gauge his reaction to their use of the word around him. One of those supervisors, Godwin, also told Cooler he was being mistreated at work because of his relationship with a white woman.

The other supervisor, Alpo, would call Cooler "you people" or "boy," instead of saying his name. And another coworker, Van Pelt, used "you people" and "boy"—on the one occasion he was willing to speak with Cooler—in order to tell Cooler he was not welcome in the break room. Eric also called Cooler "boy," and drove a car with a confederate flag decal. In addition, there was the incident in which Cooler complained of overheating while on a project site and Eric sent him to a hot toolshed, leaving space in the air-conditioned truck for Eric and another white employee. Cooler also said he received more degrading assignments than his white coworkers, including anything that would get him dirty.

"[T]he use of the slur 'nigger' is severe." See id. at 1255. But we have held that, in isolation, the use of a racial epithet on one occasion is not enough evidence

12

of severe or pervasive harassment to make a hostile work environment claim. Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1214 (11th Cir. 2008).  In Adams, this Court distinguished between supervisors using severe slurs like "nigger" to humiliate the plaintiffs and supervisors using slurs in ways that were not "directly humiliating or threatening."  Id. at 1253–55.  Here, two of Cooler's supervisors used the severe slur "nigger" in an attempt to get a reaction out of him.  A reasonable person could perceive their intent was to humiliate Cooler.  Also, unlike in Butler where the incident was isolated, there is much more evidence of other racial hostility here.  Indeed, one of Cooler's supervisors admitted to him he was being mistreated because of his relationship with a white woman.

With regard to Cooler's supervisors and coworkers calling him "boy" and "you people," the district court noted that calling a black man "boy" is "not always evidence of racial animus."  This is because the speaker's meaning may depend on context.  See Ash v. Tyson Foods, Inc., 546 U.S. 454, 456, 126 S. Ct. 1195, 1197 (2006) (per curiam).  The court added that white employees at Layne were sometimes called "boy."  But the district court ignored the context here:  Of the people who called Cooler "boy" and "you people," one was known at Layne as the "grand wizard,"[10] another used "nigger" when speaking with Cooler, and others

---

[10] Cooler also may have known that Van Pelt had talked about lynching "niggers" in front of Watson.  It is not clear from the record when Cooler learned of this incident.

13

called him gay slurs,[11] drove cars with confederate flag decals, or refused him—but not white employees—air conditioning.[12]  A reasonable person, given that context, could find that the word "boy" was meant with racial hostility.  See Adams, 754 F.3d at 1250.

His coworkers' discriminatory acts also interfered with Cooler's work.  As explained above, one of Cooler's supervisors told him that he was being mistreated at work because of his relationship with a white woman.  Cooler was also told he was not welcome in the break room.  And Cooler felt that he received more demeaning work than his white colleagues.  Further, Cooler ended up in the hospital after his white supervisor sent him to "cool off" in a hot toolshed, instead of the air-conditioned truck, which the supervisor and another white employee used for themselves.  Given the totality of the circumstances, a reasonable person could find the harassment was severe and pervasive enough to alter the terms of Cooler's employment.  Jones, 683 F.3d at 1299, 1302.  Cooler has therefore created a genuine dispute of material fact as to the fourth element of a racial hostile work environment claim.  We remand for further proceedings on this claim.

---

[11] A reasonable person could find that the people who regularly used gay slurs in reference to Cooler's hair, also called Cooler "boy and "you people" with racial animus, rather than mere benign intent.  See Ash, 546 U.S. at 456, 126 S. Ct. at 1197.

[12] The district court also failed to discuss the use of racial slurs by Cooler's supervisors in its hostile work environment analysis, despite noting them in its fact section.

14

**AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**