NIEMEYER, Circuit Judge,
dissenting:
The majority holds that an employee’s use of the term “porch monkey” twice in a 24-hour period, when talking to a fellow employee about a single workplace incident, transformed the workplace into a racially hostile environment and thereby effected a discriminatory change in the terms and conditions of the offended employee’s employment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. It holds further that the offended employee could therefore have had a reasonable belief “that a hostile work environment [was] in progress,” ante, at 284 (emphasis added), such that her opposition to the incident justified her retaliation claim against her employer. It reaches these unprecedented conclusions by relying on selected and distilled snippets from Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), which, according to the majority, justify the conclusion that “an ‘isolated incident’ of harassment can ‘amount to discriminatory changes in the *294 terms and conditions of employment,’ if that incident is ‘extremely serious,’ ” ante, at 277 (quoting Faragher, 524 U.S. at 788, 118 S.Ct. 2275).
Faragher, however, does not support the majority’s reading of it, and the majority’s conclusions are otherwise without precedent. First, in the very quotation relied on by the majority, the Faragher Court noted that “isolated incidents” — using the plural — might, if “extremely serious,” satisfy the severity requirement for racial harassment. 524 U.S. at 788, 118 S.Ct. 2275. To rationalize its holding, the majority thus reads the plural “incidents” in Faragher to refer only to a “single incident.”
Second, and more importantly, the majority fails to note that the portions of Faragher to which it cites were part of the Supreme Court’s much lengthier discussion — and substantively different message-describing the type of conduct that would not violate Title VII. In that discussion, the Court drew on several opinions from the courts of appeals and noted, for instance, that the “ ‘mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee’ would not sufficiently alter terms and conditions of employment to violate Title VII.” Faragher, 524 U.S. at 787, 118 S.Ct. 2275 (emphasis added) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir.1971)); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (same). The Court also cited approvingly to a text on discrimination law which' observed, in part, that “a lack of racial sensitivity does not, alone, amount to actionable harassment.” Id. (quoting 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 349 (3d ed.1996)). Finally, the Court summarized some of its earlier rulings in the very paragraph relied on by the majority:
So, in Harris [v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)], we explained that in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. We directed courts to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or amere offensive utterance; and whether it unreasonably interferes with an employee’s work performance. Most recently, we explained that Title VII' does not prohibit genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. A recurring point in these opinions is that simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. ,
Id. at 787-88 (emphasis, added) (citations and internal quotation marks omitted).
Without the abridged Faragher snippets, which fail to capture that case’s larger message, the majority is left with virtually no support for its holdings and certainly none from the language of Title VII or any Supreme Court decision construing it. Indeed, the Supreme Court has steadfastly maintained that, to be actionable under Title VII, conduct must be so “severe or pervasive” as “to alter the conditions of [the victim’s] employment and create an abusive working environment.” Meritor, 477 U.S. at 67, 106 S.Ct. *295 2399 (alteration in original) (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982)) (internal quotation marks omitted). And because hostile work environment claims by their “very nature involve[] repeated conduct,” the Court has further recognized — -and the majority acknowledges, see ante, at 277—that “a single act of harassment may not be actionable on its own.” Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Instead, such claims must be “based on the cumulative effect of individual acts.” Id.
To be absolutely clear, this case does not present the question of whether an employee should be allowed to call a fellow employee a “porch monkey.” Such a racially derogatory and highly offensive term does not belong in the workplace, and I condemn it. Nor does this case present the question of whether an employee, justifiably offended by being called a “porch monkey,” should report such an incident to management. Rather, the issues here are substantially narrower.
Framed by principles of well-established law, the first question in this case is whether a reasonable jury could find that an employee’s use of the term “porch monkey” twice in a 24-hour period, when talking to a fellow employee about a single incident, could objectively be considered so severe as to transform the workplace into a racially hostile environment, thereby effecting a discriminatory change in the terms and conditions of her employment. And if we were to conclude that a reasonable jury would be unable to make such a finding on the summary judgment record in this case, then the next question would be whether a reasonable jury could find that the offended employee engaged in protected activity when she reported the conduct because she reasonably believed that her employer had committed or was in the process of committing an employment practice that was made unlawful by Title VII. See 42 U.S.C. § 2000e-3(a).
I respectfully submit that the pertinent law, when applied to the facts in the record, requires a negative response to both questions. I would therefore affirm the district court’s similar conclusions.
I
Reya Boyer-Liberto, an African-American woman, began working at the Clarion Resort Fontainebleau Hotel (the “Clarion”) in Ocean City, Maryland, on August 4, 2010. The Clarion is a typical oceanfront hotel, with several restaurants, bars, a nightclub, and banquet facilities, and it typically employs about 75 people in its Food and Beverage Department. Liberto started as a morning hostess in the hotel’s main restaurant, but she proceeded to work in many of the hotel’s other Food and Beverage positions, including serving, bartending, and working banquets. According to Leonard Berger, the Clarion’s owner, Liberto struggled in all of the positions to which she was assigned, and he terminated her employment on September 21, 2010, because she “had failed at four jobs” and “[tjhere [were] no more places for her.”
During her employment, Liberto interacted with Trudi Clubb, a white woman, who was a longtime employee at the Clarion and a friend of Berger’s. Clubb worked part-time as an evening restaurant manager, and she described her responsibilities in that role as “getting things going for the early part of the day, seeing that the crew is well-equipped and ready to present themselves to the customers, getting the tables ready, getting the buffet ... ready, overseeing all the items that need to be done,” and generally helping out as needed. Clubb directly reported to Richard Heubeck, the Clarion’s Food and *296 Beverage Director, as well as Mark El-man, the hotel’s General Manager. Clubb did not participate in hiring decisions, and there is no indication in the record that she was authorized to fire, demote, or otherwise take tangible employment actions against other members of the Clarion’s staff.
In any event, whatever the exact nature of Clubb’s role at the Clarion, Liberto testified during her deposition that she never understood Clubb to be a supervisor or even a manager. To be sure, Liberto believed that Clubb, who had worked at the Clarion for close to 20 years and had a longstanding relationship with Berger, had power that she, a brand-new employee, did not have. But Liberto stated that she reported to Heubeck and to a manager named Jamie Avery, and she was adamant that she never thought of Clubb as her manager. Instead, her “understanding of ... Clubb was that she was basically a friend of Dr. Berger’s that was there to greet people and just to be a smiling face” — in other words, that Clubb was merely a “glorified hostess.” Indeed, Li-berto stated that she was “told by everyone” that she should just “humor” Clubb and that Avery specifically told her “not to go to [Clubb] because [Clubb] did not have the power to do voids or make decisions.” She explained that, although she listened to Clubb, she did so only to the extent that she had “to be respectful and listen to everyone [she] work[ed] with.” And while Clubb would occasionally ask Liberto or other employees to do tasks, Liberto testified that “it was not a regular routine ... [for Clubb to] instructf ]” other employees and that Clubb did not correct her work.
Liberto testified that, soon after she had started working at the Clarion, she felt as though Clubb had “singled [her] out” and had threatened to take advantage of her personal relationship with'Berger to make trouble for Liberto. But the incident central to this action occurred more than a month after Liberto had been hired.
Late on the night of September 14, Li-berto was serving drinks when a customer ordered a “Hula Hula,” a cocktail that was particularly time-consuming to make. When the bartender at the restaurant’s primary bar refused to make the drink, Liberto walked around to the Clarion’s “pub bar” to order the drink there. Once the drink was ready, Liberto passed through the kitchen on her way back to the dining room, even though that was a much longer route, so as to' avoid the primary bartender who refused to make the “Hula Hula.” As she did so, Clubb yelled out to Liberto that she was not supposed to cut through the kitchen, but Liberto did not hear Clubb. Clubb then approached Liberto as she was preparing the customer’s check, yelling at Liberto for ignoring her and calling Liberto “deaf.” Liberto said that the distance between the two was close enough that she could “feel [Clubb’s] breath” and that spittle from Clubb’s mouth was hitting her. Liberto shook her head and said “okay,” but largely went about her work, which made Clubb more agitated. As the episode concluded and Clubb was walking away, Clubb said that she was “going to make [Liberto] sorry” and called Liberto either a “damn or dang, porch monkey.”
At the beginning of her shift on September 15, Liberto went to Heubeck’s office to complain about Clubb’s conduct. During the meeting, Clubb came in and said to Liberto, “I need to speak to you, little girl.” Liberto told Clubb that she was currently speaking with Heubeck, but Clubb responded that she was “more important.” Liberto and Clubb then sat down at a table outside Heubeck’s office, and Clubb scolded Liberto for “abandoning [her] station” the previous night. As *297 this meeting broke up, Clubb said that “she was going to go to Dr. Berger” and “teach [Liberto] a lesson.” Using a raised voice, Clubb again called Liberto a “porch monkey.”
A couple of days later, on September 17, 2010, Liberto spoke by telephone with Nancy Berghauer, the Clarion’s Human Resources Director, regarding Clubb. Berghauer made typewritten notes of the conversation and forwarded them to Berger and Elman. The next day, September 18, Elman met with Liberto to discuss the situation and to ensure that Berghauer’s notes were accurate. That same day, Heubeck met with Clubb to discuss the incident, and Clubb denied Liberto’s allegations. Heubeck nonetheless issued Clubb a written warning.
When, on September 17, Berger learned about the conflict between Clubb and Li-berto, he asked Heubeck to update him on “exactly what was going on,” and he also asked about Liberto’s job performance. Heubeck reported that Liberto had so far performed poorly in every job to which she had been assigned. The next afternoon, Berger met with Elman to review Liber-to’s work file and discovered that Liberto had failed the Clarion’s bartending test “miserably.” When Berger indicated that he thought the Clarion should terminate Liberto’s employment, Elman and Ber-ghauer indicated that doing so “could create a situation” because of Liberto’s complaint. Berger replied that “there’s not going to be any good time to let her go. The situation will be there.” After further consulting Heubeck, Berger made the final decision to terminate Liberto’s employment, and Liberto was notified of the decision on September 21. Clubb was not involved in the decision, only learning of it a week later. Berger acknowledged in his deposition that Liberto’s complaint prompted him to take a look at her record, but he asserted that his decision to fire her “had nothing to do with her complaint” and was instead based-solely on her poor performance.
Liberto filed a charge of discrimination with the Equal Employment Opportunity Commission (“EEOC”) on September 23, 2010, alleging discrimination based on her race and retaliation based on her engagement in protected activity, in violation of Title VII. The EEOC issued Liberto a Notice of Right to Sue, following which Liberto commenced this action.
In her complaint, Liberto asserted four claims for relief: two counts of racial discrimination by virtue of a hostile work environment, in violation of Title VII (Count I) and 42 U.S.C. § 1981 (Count III), and two counts of retaliation, also in violation of Title VII (Count II) and § 1981 (Count IV). Liberto filed her Title VII claims against only the Fontainebleau Corporation, trading as the Clarion Resort Fontainebleau Hotel, but named both the Fontainebleau Corporation and Berger as defendants in her § 1981 claims.
Following discovery, the defendants filed a motion for summary judgment. Taking Liberto’s deposition testimony as true, the district court held that the offensive conduct was too isolated to support Liberto’s claims for discrimination and retaliation. Accordingly, by order dated April 4, 2013, the court entered judgment in favor of the defendants. This appeal followed.
II
In holding that the district court erred by entering summary judgment for the defendants on Liberto’s hostile work environment claims, the majority extends Title VII liability beyond the statute’s textual scope and beyond what the Supreme Court has recognized in construing the statute.
*298 The governing principles are well established. Title VII makes it “an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin.” 42 U.S.C. § 2000e — 2(a)(1). “This provision obviously prohibits discrimination with respect to employment decisions that have direct economic consequences, such as termination, demotion, and pay cuts.” Vance v. Ball State Univ., — U.S.-, 133 S.Ct. 2434, 2440, 186 L.Ed.2d 565 (2013). Since 1986, however, the Supreme Court has recognized that this provision “not only covers ‘terms’ and ‘conditions’ in the narrow contractual sense,” Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), but also forbids the “practice of creating a working environment heavily charged with ... discrimination,” Meritor, 477 U.S. at 66, 106 S.Ct. 2399 (quoting Rogers, 454 F.2d at 238); see also Harris, 510 U.S. at 21, 114 S.Ct. 367 (1993) (“The phrase ‘terms, conditions, or privileges of employment’ evinces a congressional intent to strike at the entire spectrum of disparate treatment ... in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment” (citation and some internal quotation marks omitted)). But in order to ensure that a cause of action based on an alleged hostile work environment is justified by the statute’s text, the Supreme Court has emphasized time and time again that the underlying harassment must be “so ‘severe or pervasive’ as to ‘alter the conditions of [the victim’s] employment.’ ” Faragher, 524 U.S. at 786, 118 S.Ct. 2275 (alteration in original) (emphasis added) (quoting Meritor, 477 U.S. at 67, 106 S.Ct. 2399); see also, e.g., Vance, 133 S.Ct. at 2441 (“In [hostile work environment] cases, we have held, the plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered”); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (recognizing that only harassing conduct that is “severe or pervasive” can effect a “constructive alteration[] in the terms or conditions of employment” and thus become “cognizable under Title VII”); Oncale, 523 U.S. at 81, 118 S.Ct. 998 (emphasizing that Title VU’s “prohibition of harassment ... forbids only behavior so objectively offensive as to alter the ‘conditions’ of the victim’s employment”); Harris, 510 U.S. at 21, 114 S.Ct. 367 (“When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment, Title VII is 'violated” (citations and internal quotation marks omitted)).
This demanding standard thus requires more than “conduct that is merely offensive.” Harris, 510 U.S. at 21, 114 S.Ct. 367; see also Oncale, 523 U.S. at 80, 118 S.Ct. 998 (noting that Title VII will not become “a general civility code for the American workplace” so long as courts pay “careful attention to the requirements of the statute”). Indeed, the Supreme Court has specifically recognized that the “ ‘mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee’ would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII.” Meritor, 477 U.S. at 67, 106 S.Ct. 2399 (emphasis added) (quoting Rogers, 454 F.2d at 238); see also Harris, 510 U.S. at 21, 114 S.Ct. 367. Similarly, the Court has stressed that “simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory *299 changes in the ‘terms and conditions of employment.’ ” Faragher, 524 U.S. at 788, 118 S.Ct. 2275 (citation and some internal' quotation marks omitted). It should thus come as no surprise that the Court has described the “very nature” of a hostile work environment claim as “involving] repeated conduct.” Morgan, 536 U.S. at 115, 122 S.Ct. 2061; see also id. (“The ‘unlawful employment practice’ [at issue in a hostile work environment claim] ... cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts.” (Citation omitted)).
Finally, the Court has emphasized that the impact of offensive workplace conduct on an employee’s work environment cannot be “measured in isolation.” Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam). Instead, courts must determine “whether an environment is sufficiently hostile or abusive [to support a claim] by ‘looking at all the circumstances,’ including the ‘frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.’ ” Faragher, 524 U.S. at 787-88, 118 S.Ct. 2275 (quoting Harris, 510 U.S. at 23, 114 S.Ct. 367).
Under these controlling principles, Clubb’s alleged use of the term “porch monkey” twice in less than 24 hours when talking about a single incident was, as a matter of law, not so severe or pervasive as to produce a racially hostile work environment that changed the terms and conditions of Liberto’s employment.
There is no suggestion by the majority that the alleged harassment was sufficiently pervasive to qualify — nor could there be. As such, this casé falls outside the heartland of hostile work environment claims, the “very náture [of which] involves repeated conduct.” Morgan, 536 U.S. at 115, 122 S.Ct. 2061. Instead, the only question at this juncture is whether a jury that believed Liberto’s description of events could find that Clubb’s conduct was so severe that it altered the terms and conditions of Liberto’s employment by creating a work atmosphere that was objectively racially hostile. The answer is plainly no. To be sure, the term “porch monkey” is an odious racial epithet, and any reasonable person in Liberto’s position would of course be offended by its use. But the “ ‘mere utterance of an ethnic or racial epithet,’ ” which offends an employee, does not “affect the conditions of employment to [a] sufficiently significant degree to violate Title VII.” Meritor, 477 U.S. at 67, 106 S.Ct. 2399 (quoting Rogers, 454 F.2d at 238); see also Harris, 510 U.S. at 21, 114 S.Ct. 367. In short, Liberto has not presented evidence from which a reasonable jury could find that her workplace was “permeated with ‘discriminatory intimidation, ridicule, and insult’ that [was] ‘sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.’ ” Harris, 510 U.S. at 21, 114 S.Ct. 367 (citation omitted) (quoting Meritor, 477 U.S. at 65, 67, 106 S.Ct. 2399).
The majority’s conclusion to the contrary rests on two distortions, one factual and one legal. First, the majority brazenly distorts the facts contained in the summary judgment record regarding Liberto’s understanding of Clubb’s role at the Clarion. The majority begins by stating that the current record does not establish “yvhether Clubb was actually Liberto’s supervisor or simply her co-worker.” Ante, at 279 (emphasis added). But nonetheless *300 it then proceeds to “deem Clubb to have been Liberto’s supervisor” for the purpose of “gauging the severity of Clubb’s conduct,” ante, at 280, on the theory that Clubb portrayed herself as having the ability to get Liberto fired by taking advantage of her friendship with Berger. From this, the majority goes yet further and presumes that Liberto must have believed that Clubb was effectively her supervisor, thus lending a “particularly threatening character” to Clubb’s conduct. Ante, at 280 (quoting Ellerth, 524 U.S. at 763, 118 S.Ct. 2257 (internal quotation marks omitted)).
There are, however, two significant problems with the majority’s approach. First, it is highly doubtful that Clubb, who may have wielded influence on the Clarion’s owner as a result of a personal relationship but who lacked direct authority to take tangible employment actions or even to recommend formally that such actions be taken, would qualify as Liberto’s supervisor. Indeed, the Supreme Court recently clarified what makes an employee a “supervisor” in the context of hostile work environment claims, holding that the critical consideration is whether “he or she is empowered by the employer to take tangible employment actions against the victim.” Vance, 133 S.Ct. at 2439 (emphasis added). In so holding, the Court explained that this definition would typically allow an employee’s supervisory status to be “readily determined, generally by written documentation.” Id. at 2443; see also id. at 2449 (“The interpretation of the concept of a supervisor that we adopt today is one that can be. readily applied”). The Court indicated that employees can still qualify as supervisors even if their “decisions [are] subject to approval by higher management.” Id. at 2446 n. 8. It similarly noted that if the individuals vested with decisionmaking power “have a limited ability to exercise independent discretion when making decisions” and must instead “rely on [the recommendations of] other workers who actually interact with the affected employee” then “the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations [the individual formally vested with decisionmaking authority] relies.” Id. at 2452. But both of those situations are a far cry from an employee whose only influence comes from having the ear of the company’s owner because of their personal friendship.
Moreover, even setting that issue aside, the majority’s assumption that Liberto must have perceived Clubb as her supervisor flies in the face of Liberto’s own deposition testimony about her understanding of Clubb’s place in the Clarion’s hierarchy. When asked about her understanding of Clubb’s role, Liberto responded, “My understanding of Trud[i] Clubb was that she was basically a friend of Dr. Berger’s that was there to greet people and just to be a smiling face.” She added, “I was told by everyone, oh, just, you know, humor [Clubb].... [T]hat’s pretty much what everyone would say about her.” When pressed, she was adamant that she did not understand Clubb to be a manager:
Q. Isn’t it true that you were told that [Clubb] was the restaurant manager?
A. Never.
Q. Is it your — is it your testimony that you did not know Trud[i] Clubb was the restaurant manager?
A. Absolutely that is my testimony.
Q. You never knew throughout your entire employment with the Clarion that she was a manager?
A. Never. I reported to Jamie [Avery], and Jamie, as a matter of fact, told me not to go to {Clubb] because [Clubb] did not have the power to do voids or make *301 decisions. I had to report to Jamie or Richard [Heubebk]. And at the time [Clubb] did not hold any management cards or keys as Jamie did.
(Emphasis added). And when asked whether she “thought [she] had to listen to [Clubb],” Liberto’s response was just that she “ha[d] to be respectful and listen to everyone [she] work[ed] with.” *
The majority’s conclusion that we should “deem Clubb to have been Liberto’s supervisor” for the purpose of “gauging the severity of Clubb’s conduct” simply cannot be reconciled with this testimony. To the contrary, Liberto’s understanding of Clubb as a “glorified hostess” who everyone “humor[ed]” substantially lessens the impact that Clubb’s isolated statements could have had on Liberto’s work environment. See ante, at 278 (“[A] supervisor’s use of [a racial epithet] impacts the work environment far more severely than use by coequals” (second alteration in original)) (quoting Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir.1993)) (internal quotation marks omitted).
In addition to relying on a blatant mis-characterization of Liberto’s understanding of Clubb’s role at the Clarion, the majority’s conclusion that Liberto’s hostile work environment claims should reach a jury also rests on a faulty interpretation of a handful of words from the Supreme Court. Specifically, the majority places a great deal of emphasis on the Court’s observation in Faragher that “simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the ‘terms and conditions of employment.’ ” 524 U.S. at 788, 118 S.Ct. 2275 (emphasis added) (citation and some internal quotation marks omitted). Indeed, the majority’s holding, distilled to its essence, rests entirely on its conclusion that this is “the type of case contemplated in Faragher where the harassment, though perhaps ‘isolated,’ can properly be deemed to be ‘extremely serious.’ ” Ante, at 281.
But in Faragher, the Supreme Court referred to “incidents,” 524 U.S. at 788, 118 S.Ct. 2275, not to a single incident. And five years later, the Court in Morgan confirmed that “repeated conduct” is the stuff of a hostile work environment. 536 U.S. at 115, 122 S.Ct. 2061 (emphasis added). Moreover, while the Faragher Court did not elaborate on what it envisioned as the kind of extremely serious isolated incidents that may produce a hostile work environment, we know from Meritor and Harris that such incidents cannot be the “mere utterance of an ethnic or racial epithet.” Meritor, 477 U.S. at 67, 106 S.Ct. 2399 (quoting Rogers, 454 F.2d at 238) (internal quotation marks omitted). As the Court has made clear, the making of such a statement in the workplace, although highly offensive, “does not sufficiently affect the conditions of employment to implicate Title VII.” Harris, 510 U.S. at 21, 114 S.Ct. 367. It is true that Clubb’s alleged conduct was reprehensible. But it involved no physical assault or threat of *302 physical harm. Cf. 3 Lex K. Larson, Employment Discrimination § 46.05[3][b], at 46-82 (2d ed.2012) (noting that “a single incident of physical assault against a coworker that is motivated by [discriminatory] animus can qualify as severe enough to-constitute an alteration of the co-worker’s conditions of employment”). Moreover, even though the first encounter took place in a crowded dining room, it appears that no one heard Clubb direct the epithet at Liberto on either occasion, indicating that the name-calling was not publicly humiliating. And again, Liberto thought that she was being upbraided by a co-worker, not her supervisor. Taken together, these considerations show that, as a matter of law, Clubb’s alleged conduct did not amount to the “extremely serious” “isolated incidents” that the Faragher Court envisioned as being capable of effecting a “discriminatory change[ ] in the ‘terms and conditions of [the plaintiffs] employment.’ ” 524 U.S. at 788, 118 S.Ct. 2275.
The majority acknowledges that this case marks the first time that our court has concluded that a reasonable jury could find the presence of a hostile work environment based on what was, at most, two repeated statements relating to a single incident. See ante, at 280-81. What the majority does not acknowledge, however, is that today’s decision makes our court an outlier among the other courts of appeals. And instead of being straightforward about that fact, the majority attempts to bolster its conclusion with citations to the Eleventh Circuit’s decision in Adams v. Austal, U.S.A, L.L.C., 754 F.3d 1240 (11th Cir.2014), and the D.C. Circuit’s decision in Ayissi-Etoh v. Fannie Mae, 712 F.3d 572 (D.C.Cir.2013). See ante, at 280-81. But both cases involved conduct more pervasive and/or more severe than that alleged by Liberto here.
In Adams, one of the plaintiffs alleged that his supervisor carved the slur “porch monkeys” into the aluminum of the ship on which they were working, and the Eleventh Circuit observed that that “isolated act” was “severe.” 754 F.3d at 1254. But the same plaintiff also alleged that he “saw one coworker wear a shirt with a Confederate flag”; that he “regularly saw racist graffiti in the men’s restroom”; and that when he reported the racist graffiti, his supervisor responded by saying that “it’s always been like that and if [he] didn’t like it [he could] quit.” Id. at 1253 (alterations in original) (internal quotation marks omitted). It was based on the totality of these allegations that the Eleventh Circuit concluded that “the harassment [the plaintiff] experienced was frequent and severe,” such that “[a] reasonable jury could find that [his] work environment was objectively hostile.” Id. at 1253-54 (emphasis added).
Similarly, the harassment in Ayissi-Etoh was both more pervasive and more severe than the harassment at issue here. In that case, the plaintiff — an African-American senior financial modeler — asked his company’s Chief Audit Executive why he had not received a raise in conjunction with a recent promotion. 712 F.3d at 574-75. In response, the Executive told him, “For a young black man smart .like you, we are happy to have your expertise; I think I’m already paying you a lot of money.” Id. at 575 (internal quotation marks omitted). ' Several months later, the plaintiff was discussing his work responsibilities with the company’s Vice President of Internal Audit when the meeting “became heated” and the Vice President yelled at him, *‘Get out of my office nigger.” Id. Although the plaintiff missed work and was diagnosed with an anxiety disorder, he was forced to continue working with the Vice President during the ensuing three-month investigation. Id. Based on this *303 evidence, the D.C. Circuit held that the plaintiff was entitled to a jury trial on his hostile work environment claim. These circumstances in Ayissi-Etoh are readily distinguishable from those presented here. First, as the court in Ayissi-Etoh noted, the hostile work environment was precipitated not by a single event, but rather by two independent statements made by two different high-ranking company officials who were both indisputably supervisors of the plaintiff. Id. at 577-78. Those statements ultimately led to psychological problems and directly caused the plaintiff .to miss work. Id. at 577. Second, the racist comments were made during conversations about the plaintiffs pay and work assignments, thus increasing the statements’ ability to “alter the conditions of the victim’s employment.” Harris, 510 U.S. at 21, 114 S.Ct. 367. By contrast, in the case at hand, (1) there was only one incident involving one alleged harasser; (2) the alleged harasser was perceived by the plaintiff to be a “glorified hostess” with no“power to ... make decisions”; and (3) although the alleged harasser denied making the offensive statement, the employer promptly issued her a written reprimand, warning her “to be cautious [that] the language or phrases [that] she uses can not [sic] be perceived as racist or derogatory.”
For the reasons given, Clubb’s alleged use of the term “porch monkey” twice in less than 24 hours when talking about a single incident was not, as a matter of law, sufficiently severe or pervasive to create a racially hostile work environment that altered the terms and conditions of Liberto’s employment. I would therefore affirm the district court’s summary judgment on Li-berto’s Title VII hostile work environment claim.
For the same reasons, I would also affirm the district court’s summary judgment on Liberto’s hostile work environment claim under 42 U.S.C. § 1981. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir.2001) (recognizing that hostile work environment claims under Title VII and § 1981 are governed by the same principles).
Ill
If, as the majority holds, Clubb’s twice calling Liberto a “porch monkey” in connection with a single workplace incident was a practice made unlawful by Title VII, it would necessarily follow that Liberto also stated a retaliation claim, for such a claim arises when an employee opposes any practice made an unlawful practice by Title VII and therefore is subjected to an adverse employment action. See ante, at 281. The majority could have ended its retaliation claim analysis without saying more. But it did not. Instead, it gratuitously proceeded to adopt an unprecedented standard for retaliation claims that is much broader than necessary to resolve Liberto’s claim. In doing so, it also unnecessarily overruled part of our decision in Jordan v. Alternative Resources Corp., 458 F.3d 332 (4th Cir.2006).
A
As to its new, broad standard for retaliation claims, the majority moves far beyond the scope of any statutory language or any Supreme Court precedent to conclude that, even when an employee opposes a single offensive incident, she has “a reasonable belief that a hostile work environment is occurring” whenever the incident is humiliating. Ante, at 284; see also ante, at 284-85. Applying that standard, the majority concludes that- because “ ‘porch monkey’ is a racial epithet that is not just humiliating, but ‘degrading and humiliating in the extreme,’ ” Liberto was necessarily opposing a hostile work environment that was “in progress” when she brought the racial *304 slurs to management’s attention. Ante, at 285 (quoting Spriggs, 242 F.3d at 185). Undoubtedly, this gratuitous and untenable holding will generate widespread litigation over the many offensive workplace comments made everyday that employees find to be humiliating.
Turning to the statute, as we must, Title VII’s antiretaliation provision makes it unlawful “for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII].” 42 U.S.C. § 2000e-3(a). Read most naturally, this provision provides protection from retaliation to an employee who has opposed an employment practice that is actually unlawful under Title VII, including her employer’s maintenance of a racially hostile work environment. And reading § 2000e-3(a)’s language generously to give effect to its purpose, we have held that an employee also engages in protected activity when she opposes an employment practice that she reasonably believes to be unlawful, see EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406-07 (4th Cir.2005), although the Supreme Court has not yet gone so far. Specifically, in Breeden, 532 U.S. at 270, 121 S.Ct. 1508, the Court declined “to rule on the propriety of [the Ninth Circuit’s] interpretation” of § 2000e-3(a) as “protecting] employee ‘opposition]’ not just to practices that are actually ‘made ... unlawful’ by Title VII, but also to practices that the employee could reasonably believe were unlawful,” “because even assuming [that its interpretation] is correct, no one could reasonably believe that the incident [at issue] violated Title VII.” Finally, we have gone one step further, recognizing that an employee is protected from retaliation if, at the time of her complaint, she had “an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress.” Jordan, 458 F.3d at 341 (emphasis added).
Under the Jordan standard, when an employee’s complaint relates to another employee’s harassing conduct, we do not require the harassment to have already risen to the level actionable under Title VII in order for her opposition activity to be protected from retaliation. But when the offending conduct has not risen to the level of a practice made unlawful by Title VII, we also recognized that it would be inappropriate to “simply assume, without more, that the opposed conduct [would] continue or [would] be repeated unabated.” Jordan, 458 F.3d at 341. Instead, we held that in this incipient stage, a plaintiff must be able to point to evidence that “reasonably supports the inference” that the conduct being objected to was “likely to recur at a level sufficient to create a hostile work environment.” Id. In other words, for an employee’s report of objectionable conduct that has not yet become unlawful under Title VII to qualify as protected activity, the employee must, at the very least, have an objectively reasonable belief that a hostile work environment would result, “based on circumstances that the employee observes and reasonably believes.” Id.
Here, the majority adopts a standard far beyond that which we recognized in Jordan and far beyond what any court of appeals has recognized. It holds that an employee’s single complaint about a single incident, regardless of whether the incident is actually unlawful under Title VII or whether the employee reasonably believes that the incident is likely to recur, can be the basis for a legitimate retaliation claim, so long as the conduct is humiliating. See ante, at 284-85. This new standard will surely generate many new questions about which offensive workplace comments are objectively humiliating and *305 lead to an expansion of litigation far beyond Title VII’s design.
I would conclude in this case that the district court correctly entered summary judgment for the defendants on Liberto’s retaliation claim because, as a matter of law, she did not oppose activity that Title VII protects from retaliation when she reported Clubb’s conduct to the Clarion’s Human Resources Director. In light of all the circumstances, Clubb’s use of an offensive racial epithet twice in less than 24 hours was insufficiently severe to give Li-berto an objectively reasonable belief that she was complaining about the presence of a racially hostile work environment, rather than simply about another employee’s inappropriate conduct. Certainly, Liberto could have reasonably concluded from Clubb’s demeaning statement that Clubb herself was a racist. But the fact that a single employee has revealed herself through an isolated incident to be bigoted does not translate into an objectively reasonable belief that the workplace itself has become abusive to employees because of their race. Cf. Butler v. Ala. Dep’t of Transp., 536 F.3d 1209, 1214 (11th Cir.2008) (“[N]ot every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual ” (emphasis added)) (quoting Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir.1997)) (internal quotation marks omitted).
Moreover, Clubb’s statements were, as a matter of law, too isolated to give Liberto an objectively reasonable ’belief that the offensive conduct was likely to ripen into a hostile work environment. Liberto has not identified any evidence in the record suggesting that workplace racism was afoot prior to Clubb’s statements, nor any evidence suggesting that she had reason to believe that her supervisors and eo-work-ers would tolerate such conduct or permit it to recur. Indeed, after Liberto reported the incident, the Clarion’s management promptly issued a written reprimand to Clubb, warning her to be cautious about her language.
While Liberto had every right to be offended by Clubb’s use of a racial epithet and acted reasonably and responsibly in reporting the incident to Clarion’s Human Resources Director, she lacked a reasonable belief, as required by the language of Title VII, that she was opposing her employer’s commission of “a[ ] practice made ... unlawful ... by [Title VII].” 42 U.S.C. § 2000e-3(a). For that reason, I would conclude, as a matter of law, that she did not engage in protected activity and that the district court therefore properly entered summary judgment against her on her retaliation claims.
B
In addition to adopting a broad and unprecedented standard for evaluating retaliation claims under Title VII, the majority also gratuitously reverses a portion of Jordan in a manner by which Judge King, the majority’s author, explicitly vindicates his dissent in Jordan, notwithstanding his concession that this case presents distinguishing circumstances.
Notably, the majority does not overturn all of Jordan. It in no way suggests, for example, that the isolated incident at issue in -that case was sufficiently severe to create a hostile work environment. Indeed, by “observ[ing] that the district court improperly analogized this matter ... to Jordan,” the majority instead confirms that “a racist remark that was made by a mere coworker and not aimed at [the plaintiff] or any other employee” does not amount to a hostile work environment. Ante, at 281. *306 Nor does the majority indicate that the plaintiff in Jordan had a reasonable belief that a hostile work environment was taking shape at the time he reported his coworker’s racist comment to his supervisors. Rather, the only portion of Jordan that the majority overrules is its already liberalizing rule that a plaintiff whose retaliation claim is based on an objectively reasonable belief that a hostile work environment was in progress, but not yet in existence, need only point to some evidence indicating that such an environment was “likely to occur.” Jordan, 458 F.3d at 340; see ante, at 282.
The majority claims that this aspect of Jordan “is incompatible with Crawford [v. Metropolitan Government of Nashville & Davidson County, 555 U.S. 271, 279, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009) ], as well as other Supreme Court decisions directing that Title VII’s antiretaliation provision be interpreted ‘to provide broad protection from retaliation.’ ” Ante, at 283 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). An analysis of these cases, however, belies the notion that they are in tension with Jordan or that, with these decisions, the Supreme Court has given us license to provide employees with “broad[er] protection from retaliation” than the text of the statute justifies.
For example, Crawford resolved the narrow question of whether “an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer’s internal investigation” has opposed an unlawful employment practice within the meaning of Title VU’s anti-retaliation provision. 555 U.S. at 273, 129 S.Ct. 846. In holding that such an employee had engaged in protected activity, the Supreme Court’s analysis focused on the “ordinary meaning” of the term “oppose,” leading the Court to conclude — as a matter of statutory interpretation — that “[tjhere is ... no reason to doubt that a person can ‘oppose’ by responding to someone else’s question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.” Id. at 276-78, 129 S.Ct. 846. Clearly, nothing in this holding is “incompatible” with Jordan. Ante, at 283.
Similarly, the issue in Burlington Northern was whether “Title VII’s antiretaliation provision forbids only those employer actions and resulting harms that are related to employment or the workplace,” as does the statute’s substantive antidiscrimi-nation provision. 548 U.S. at 61, 126 S.Ct. 2405. In answering that question in the negative, the Court emphasized that language in the antidiscrimination provision “explicitly limit[s] the scope of that provision to actions that affect employment or alter the conditions of the workplace,” whereas “[n]o such limiting words appear in the antiretaliation provision.” Id. at 62, 126 S.Ct. 2405. The Court further reasoned that the difference between the two provisions’ purposes confirms “that Congress intended the differences that its language suggests.” Id. at 63, 126 S.Ct. 2405. It was on this basis that the Court rejected the view that it would be “ ‘anomalous’ to read the statute to provide broader protection for victims of retaliation than for those whom Title VII primarily seeks to protect, namely, victims of race-based, ethnic-based, religion-based, or gender-based discrimination.” Id. at 66, 126 S.Ct. 2405. As such, despite the majority’s .suggestion to the contrary, Burlington Northern does not stand for the proposition that courts must always adopt the broadest possible *307 construction of Title YII’s antiretaliation provision, and it certainly does not authorize courts to afford plaintiffs protection beyond what the statute itself provides.
At a more general level, the majority faults the Jordan standard as being at odds with “the hope and expectation that employees will report harassment early, before it rises to the level of a hostile work environment.” Ante, at 282. Along these lines, the 'majority suggests that, when combined with the early reporting “compelled by the Ellerth/Faragher defense,” Jordan places an employee who has experienced an isolated incident of harassment in an untenable position; leaving her vulnerable to retaliation if she reports her supervisor’s conduct and insulating her employer from liability should she fail to report it. Ante, at 282. The majority’s dilemma, however, is a false one. First, the Ellerth/Faragher affirmative defense only enables an employer to avoid vicarious liability for its supervisor’s creation of a hostile work environment if the employer can prove both that it “exercised reasonable care to prevent and correct promptly any ... harassing behavior, and ... that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.” Ellerth, 524 U.S. at 765, 118 S.Ct. 2257 (emphasis added); see also Faragher, 524 U.S. at 807, 118 S.Ct. 2275. It is highly doubtful, however, that an employer would be able to show that an employee acted unreasonably by choosing not to immediately report an isolated incident of workplace misconduct that was not in itself sufficient to give rise to a reasonable belief that a hostile work environment was in progress. Cf. Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 270 (4th Cir.2001) (holding that the employer had established the affirmative defense because, “[i]n light of- th[e] long-term and persistent harassment, [the plaintiff] cannot be excused from failing to report [her supervisor’s conduct]” sooner (emphasis added)). Second, the majority combines the qualitative requirement of objective reasonableness in reporting harassment with the laches concept described by the Supreme Court in Faragher, 524 U.S. at 807, 118 S.Ct. 2275, and developed by this court in Matvia, 259 F.3d at 270, in order to invent a fictitious Catch-22. In actuality, an employee only risks retaliation by reporting too early when there is insufficient conduct about which to complain under Title VII, and she only risks dismissal of her claim for reporting too late when she inordinately delays coming forward.
More to the point, however, it is not the role of this court to incentivize the early reporting of objectionable conduct where Congress itself has not seen fit to do so. Indeed, Congress could have written Title VII’s antiretaliation provision to provide protection to every employee who reports any offensive, racially or sexually charged workplace incident that makes him or her uncomfortable. But it did not. See, e.g., Breeden, 532 U.S. at 269-71, 121 S.Ct. 1508 (holding that an employee did not engage in protected activity when she complained that, during a meeting, her supervisor read aloud a sexually explicit statement, which a job applicant had purportedly made, before looking at her and stating, “I don’t know what that means,” and then chuckling along with a male employee who offered to explain the comment to him later). Instead, Congress chose to protect only employees who have “opposed any practice made an unlawful employment practice by [Title VII].” 42 U.S.C. § 2000e-3(a). We have already liberally interpreted' this provision to protect employees who possess an objectively reasonable belief that they are complaining about a Title VII violation that has occurred or *308 is in progress, a standard .that serves to protect employees in close cases. But we cannot simply presume that a single incident of racially charged workplace misconduct will inevitably ripen into an actual racially hostile work environment, lest our interpretation become completely untethered from Title VIPs text. Instead, a plaintiff whose retaliation claim is based on an objectively reasonable belief that she was opposing a hostile work environment that was in the process of developing must be able to point to some evidence that supports the inference that such an environment was “likely to occur.” Jordan, 458 F.3d at 340 (emphasis added).
Instead of requiring the plaintiff to produce such evidence, the majority concludes that opposing an incident that is humiliating, regardless of whether it could lead to a hostile work environment, is protected. Ante, at 284-85. Even a cursory consideration of this new per se rule quickly reveals its problems. An isolated incident of humiliating harassment is, of course, more serious than “a mere offensive utterance.” Harris, 510 U.S. at 23, 114 S.Ct. 367. But it is far from clear why a single incident of humiliating harassment that is insufficient to support a reasonable belief that a hostile work environment had come into existence would nonetheless give rise to a reasonable belief that a hostile work environment was in the process of developing. The majority must be assuming that, if a single instance of humiliating harassment has occurred, then objectionable conduct is bound to be repeated at a level sufficient to create a hostile work environment. But this, of course, does not follow. And I can anticipate much hand-wringing in the legal community when determining whether a particular incident qualifies as humiliating or whether it remains merely an offensive utterance.
The majority’s position is also entirely pessimistic about the ability and desire of employers to stop the progression from isolated utterances of racial slurs to a hostile work environment. Indeed, the majority manifests a fundamental distrust of employers, assuming that, once a humiliating epithet is uttered, the development of a hostile work environment is a fait accom-pli — in other words, that employers are powerless or unwilling to prevent a descent into pervasive hostility. This assumption, of course, finds no more support in Title VII or Supreme Court precedent than it does in basic logic. What is more, even the most conscientious employer will now be reluctant to fire an objectively underperforming employee who has reported a racial epithet that could be considered humiliating because, under the majority’s standard, that employee is effectively presumed to have reasonably believed that he was protesting an unlawful employment practice when he made his complaint. This presumption is at odds with Title VII, the Supreme Court’s jurisprudence, and the fundamental character of employers in America’s modern workplace.
IV
At bottom, I would conclude, as did the district court, that while Clubb’s comments to Liberto were unacceptably offensive, they were made in connection with an isolated incident, and therefore they were insufficient to demonstrate the existence of a hostile work environment that altered the terms and conditions of Liberto’s employment. I would also conclude, as did the district court, that because Title VII’s antiretaliation provision requires, as we have liberally construed it, that an employee’s opposition must be to a hostile work environment that she reasonably believed *309 was in progress, Liberto’s retaliation claims also fail. Thus, I would affirm.

 In support of its dubious contention that Li-berto perceived Clubb to be in a position to have her employment terminated, the majority points to a September 18, 2010 email from Elman to Heubeck and Berghauer in which Elman recounted his meeting earlier that day with Liberto. See ante, at 271. Elman wrote that he had informed Liberto that Clubb was her "boss.” But as the majority itself acknowledges, at this stage of the case, we must accept the version of events Liberto recited in her deposition testimony. See ante, at 269 n. 1. And Liberto’s testimony contradicts El-man’s apparent understanding of Clubb’s relationship to Liberto. Moreover, in light of the adamancy with which Liberto testified that she "never” understood Clubb to be a manager, we should not use Elman’s email to - refute Liberto’s clearly stated understanding.